UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                                            :
KIM THOMAS,
                                                            :
                    Plaintiff,                                  OPINION & ORDER
                                                            :
         -against-                                             19 Civ. 1177 (GWG)
                                                            :
COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,                                    :

                    Defendant.                              :
------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

    Plaintiff Kim Thomas brings this action pursuant to 42 U.S.C. § 405(g) for judicial

review of the final decision of the Commissioner of Social Security (the "Commissioner")

denying her claim for supplemental security income ("SSI") under the Social Security Act (the

"Act").  Thomas and the Commissioner both move for judgment on the pleadings pursuant to

Federal Rule of Civil Procedure 12(c).[1]  For the reasons stated below, Thomas's motion for

judgment on the pleadings is denied and the Commissioner's motion for judgment on the

pleadings is granted.

I.  BACKGROUND

    A.  Procedural History

    Thomas filed an application for SSI benefits on July 22, 2014, alleging a disability onset

_____

    [1]  See Motion for Judgment on the Pleadings, filed Aug. 12, 2019 (Docket # 17);
Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings, filed Aug.
12, 2019 (Docket # 18) ("Pl. Mem."); Notice of Response and Cross-Motion, filed Oct. 11, 2019
(Docket # 19); Memorandum of Law in Support of the Commissioner's Cross-Motion for
Judgment on the Pleadings, filed Oct. 11, 2019 (Docket # 20) ("Def. Mem."); Reply
Memorandum in Further Support of Plaintiff's Motion for Judgment on the Pleadings, filed Nov.
1, 2019 (Docket # 21) ("Pl. Reply").

date of June 1, 2014.  <u>See</u> Certified Administrative Record, filed June 13, 2019 (Docket # 9)

("R."), at 79, 171-79.  The Social Security Administration ("SSA") initially denied Thomas's

application on November 19, 2014.  R. 80-85.  Thomas requested a hearing before an

administrative law judge ("ALJ") to review the denial.  R. 86-88.  A hearing was held on June

12, 2017.  R. 27-67.  In a written decision dated March 22, 2018, the ALJ found that Thomas

was not disabled.  R. 7-26.  The Appeals Council denied Thomas's request for review.  R. 1-6.

Thomas timely filed this action <u>pro se</u> on February 6, 2019.  <u>See</u> Complaint, filed Feb. 6, 2019

(Docket # 2).  An attorney entered a notice of appearance for Thomas on March 28, 2019.  <u>See</u>

Notice of Appearance by Charles E. Binder, filed July 16, 2019 (Docket # 13).  Thomas moved

for judgment on the pleadings on August 12, 2019 (Docket # 17), and the Commissioner

subsequently cross-moved for judgment on the pleadings on October 11, 2019 (Docket # 19).

     B.  <u>The Hearing Before the ALJ</u>

     On June 12, 2017, Thomas and her attorney, Purcell Williams, appeared at the hearing

before the ALJ in the Bronx, New York.  R. 27.

     Thomas testified that she was born on June 15, 1969, and was 47 years old at the time of

the ALJ hearing.  R. 35.  She had gained 15 to 30 pounds in the last 12 months and thought the

increase might be due to her taking Seroquel for her psychiatric impairment.  R. 35-36.  Thomas

was single and lived alone, except that her nine-year old daughter sometimes lived with her on

the weekends.  <u>Id.</u>  Thomas previously had custody of her daughter during the week, with the

daughter's father having visitation rights on the weekend, however "ACS" got involved after

Thomas accused the daughter's father of sexually molesting the child, at which point "[t]hey

reversed the roles and then gave him custody of [her] daughter."  R. 37.

     Thomas testified that she came to the hearing alone in a cab, but that she was not able to

travel by herself on a daily basis because she suffered from anxiety around too many people and got irritated.  R. 38.  Sometimes, Thomas thought about what happened to her daughter and started crying.  Id.  She did not make regular visits with family or friends but went to church "[o]nce in a blue moon."  Id.  Thomas did not participate in sports or hobbies, did not drink alcohol, and had not traveled out of New York in the previous two years.  R. 39.  Thomas smoked a pack of cigarettes every two days because she was "stressed out."  Id.

Thomas testified that she was diagnosed with depression, anxiety, and bipolar disorder. Id.  Thomas was not sure of the exact dates of her diagnoses, but stated she started feeling depressed after she had her daughter in 2008.  R. 40.  Thomas's mother suggested she seek treatment for her mental conditions and Thomas went to the Emma Bowen Community Service Center where she was seen by Dr. Keith Brackett.  Id.  She went to see Dr. Brackett because she felt down, worthless, kind of angry, tired, and like she did not want to really be around people. R. 41.  Thomas continued treatment after initially seeing Dr. Brackett.  Id.  Thomas had previously seen Dr. Erica Vassell, a therapist, and was also seeing her psychiatrist, Dr. Ravelo, at the time of the hearing.  R. 41-43.  She had been prescribed "[a] lot" of medications, and knew she has been prescribed Ambien and Seroquel, but did not remember the names of all of the medications.  R. 42.  Thomas still had therapy sessions with her psychiatrist Dr. Ravelo, but she no longer saw Dr. Vassell.  R. 43.  Thomas had not seen a change in her symptoms after taking medications and engaging in talk therapy.  Id.  Thomas testified that she still felt extremely overwhelmed and had feelings of worthlessness when she did not have her daughter with her on a daily basis.  R. 44.  Thomas had never been hospitalized for psychiatric reasons.  R. 46. Thomas stated she had one friend who was a neighbor, and that they talked on the phone and sometimes saw each other face to face when they sat on a bench together.  R. 44-45.  Thomas has

one sister, but she was not in touch with her.  R. 45.  Thomas saw her mother several times a

month and got along well with her.  R. 47.  Thomas got along with her psychiatrist, Dr. Ravelo,

and his staff, but she did not get along with Dr. Vassell, because speaking with her brought out a

lot of depression.  R. 45-46.[2]

Thomas was born in New York City, completed the 11th grade, but did not have a high

school diploma or GED.  R. 53-54.  She cooked at home maybe once a week.  R. 54.  She could

dress herself but did not take care of her personal hygiene when she fell into a deep depression,

sometimes for up to two-and-a-half weeks.  R. 54.  Thomas last worked in 2014 as a home health

aide but stopped because of depression from going to family court for the custody dispute over

her daughter.  R. 55.  Thomas testified that most of her work history involved being a home

health aide.  Id.  Thomas was also self-employed for a period in 2008 when she did "childcare."

R. 56.  When asked by the ALJ whether there was anything else that Thomas wanted to state

about her case, Thomas responded that she had insomnia and the situation with her daughter and

family court was like a "nightmare" in her mind.  Id.

Thomas next responded to questioning from her attorney.  R. 57.  When asked to define

anxiety, Thomas responded that it meant "overwhelming," "not accomplishing what you

started," and a "racing" heart.  Id.  When asked to define bipolar disorder, Thomas stated it

meant that one minute she was okay and the next minute she did not want to exist.  R. 58.  She

stated she would be lucky to have "two good days" a week.  Id.  Her attorney noted that when the

hearing was stopped between the ALJ's questioning of Thomas and the attorney's questioning of

Thomas, Thomas began crying.  R. 59.  Thomas stated that she cried basically every other day.

---

[2]  Thomas also testified about her arthritis, R. 46-50, and diabetes, R. 51-53.

4

Id.  Thomas stated she had trouble remembering things, including appointments.  Id.  Thomas

wrote down her medical appointments in a calendar but would forget to check the calendar.  R.

60.  She tried to take her medications every day, but sometimes she forgot or thought she did not

want to take them.  Id.  Thomas reiterated that she did not take public transportation because she

gets irritated when too many people are around her.  R. 61.  Thomas had taken a car service to

doctor's appointments ever since being hospitalized for certain physical ailments.  R. 61-62.

That hospitalization resulted in paperwork that allowed Thomas to take a car service to her

doctor's appointments.  R. 62.

Thomas testified that she has had insomnia since 2008, and that it made her feel very

irritable.  Id.  In either 2010 or 2011 she went four days without sleeping.  R. 63.  Thomas took

Seroquel, which helped her sleep, but only for three hours.  Id.  Thomas testified she was not

sure when she fell asleep, but she only slept three hours each night.  R. 64.  When she woke up,

she was sluggish and the sunlight burned her eyes.  Id.  She frequently slept during the day for

two to three hours.  R. 65.  Thomas sometimes took Seroquel during the day to help her sleep.

R. 65-66.  She thought one of the side effects of her medication was her loss of memory.  R. 66.

At the end of the hearing, the record was kept open to allow for the submission of records from a

psychiatric consulting examiner.  R. 66.

    C.  The Medical Evidence

The Commissioner and Thomas have both provided summaries of the medical evidence

in the record.  See Pl. Mem. at 1-8; Def. Mem. at 4-17.  The summaries are substantially

consistent with each other, although the Commissioner's summary is more comprehensive.  In

any event, the Court directed the parties to specify any objections they had to the opposing

party's summary of the record and neither party has done so.  See Scheduling Order, filed July

5

25, 2019 (Docket # 16 ¶ 5).  Accordingly, the Court adopts both parties' summaries of the

medical evidence as accurate and complete for purposes of the issues raised in this suit.  We

discuss the medical evidence pertinent to the adjudication of this case in section III below.

     D.  The ALJ's Decision

The ALJ issued his decision on March 22, 2018.  R. 10-21.  First, the ALJ noted that

Thomas submitted additional written evidence less than five days before the scheduled hearing

date, but because the requirements of 20 C.F.R. § 416.1435(b) were satisfied, the additional

evidence was admitted into the record despite being submitted past the deadline.  R. 10.  The

ALJ noted that, in addition to the evidence that was in the record at the time of the hearing, his

decision was also based on records from vocational expert Kimberly Mullimax and consultative

examiners Cheryl Archbald and Amory Carr.  Id.

Following the five-step test set forth in SSA regulations, the ALJ held at step one that

Thomas had not engaged in substantial gainful activity since her application date of July 22,

2014.  R. 12.  The ALJ held that Thomas was 45 years old, had a limited education, and was able

to communicate in English.  R. 20.  At step two, ALJ held that Thomas had the severe

impairments of right knee arthritis, obesity, diabetes mellitus, hypertension, major depressive

disorder, and anxiety, R. 12, and that those severe impairments significantly limited the ability of

Thomas to perform basic work activities as required by SSR 85-28, R. 13.  However, at step

three, the ALJ concluded that Thomas did not have an impairment or combination of

impairments that met or medically exceeded the severity of one of the impairments listed in 20

C.F.R. Part 404, Subpart P, Appendix 1.  R. 13.  The ALJ specifically considered the listings

under 1.00 (Musculoskeletal System) and 9.0 (Endocrine Disorders).  Id.  The ALJ also

considered SSR 02-1p (Obesity) both singularly and in combination with Thomas's other

impairments.  Id.  The ALJ also considered listing 12.04 (affective disorders) and listing 12.06

(anxiety-related disorders).  Id.  With respect to listings 12.04 and 12.06, the ALJ considered

whether the "paragraph B" criteria were satisfied.  Id.  The ALJ explained that the paragraph B

criteria are satisfied when the claimant has one extreme or two marked limitations in the four

broad areas of functioning relevant to paragraph B.  Id.

The ALJ found that Thomas had a mild limitation in understanding, given that Thomas

had difficulty following instructions but was able to provide information about her health and

describe her prior work history.  Id.  In interacting with others, the ALJ found that Thomas had a

moderate limitation because she did not like to be around others and had only one friend;

however, Thomas also stated she maintained a relationship with her mother, sister, and daughter.

Id.  The ALJ found that Thomas had a moderate limitation with regard to concentrating because

Thomas had impaired attention, concentration, and remote and recent memory skills according to

the psychiatric consultative examiner.  Id.  The ALJ also found that Thomas had a mild

limitation in adapting or managing herself because she had a depressed and restricted mood but

had good hygiene, no temper problems, and got along well with healthcare providers.  Id.

Because the ALJ did not find that Thomas had either one extreme or two marked limitations, the

ALJ concluded the paragraph B criteria were not satisfied.

The ALJ also concluded the "paragraph C" criteria were not satisfied because there was

no evidence that Thomas required a highly structured setting that diminished her symptoms or

that her mental disorder symptoms caused her to have a minimal capacity to adapt to changes to

her environment or demands that were not already part of her everyday life.  R. 14.  The ALJ

noted that the paragraph B limitations were not a residual functional capacity assessment

("RFC").  Id.  Thus, before moving to step four, the ALJ proceeded to assess Thomas's RFC.  Id.

The ALJ found that:

> the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she can stand for 2 hours, walk for 2 hours, and sit for 4 hours in an eight-hour workday, with normal breaks . . . . Psychiatrically, the claimant can understand, retain and follow simple instructions, and sustain sufficient attention to perform simple repetitive tasks and routine with no strict production pace or assembly line quotas where interaction with coworkers and supervisors is occasionally [sic] and where there is no interaction with the public. Finally, she has sufficient capability to respond appropriately to usual work situations; and deal with changes in a routine work setting.

Id.

We next summarize the ALJ's consideration of the record insofar as it related to Thomas's psychiatric treatment.

First, the ALJ considered records from Thomas's treatment by Dr. Francis Hayden at Wingspan Psychiatric from 2014 to 2015.  R. 15.  Dr. Hayden diagnosed Thomas with major depressive disorder and treated Thomas with medication.  Id.  Dr. Hayden made note in January 2015 that Thomas saw a therapist only one time because she was "tired of talking."  Id.

The ALJ also considered the notes from Dr. Diego Ponieman's treatment of Thomas for diabetes mellitus type II, obesity, hypertension, and anxiety disorder.  Id.  Dr. Ponieman's records indicated that in 2016, Thomas stated on multiple occasions that she did not feel depressed, down, or hopeless.  Id.  On March 8, 2016, Dr. Ponieman filled out a disability impairment questionnaire that diagnosed Thomas with generalized anxiety disorder, morbid obesity, depression, pain disorder, and chronic fatigue.  R. 16.  Dr. Ponieman's questionnaire concluded that Thomas could not work an eight-hour shift due to her chronic fatigue.  Id.  The ALJ gave some weight to Dr. Ponieman's statements because they supported the conclusion that Thomas had a reduced RFC to perform work activities.  R. 19.  However, the ALJ noted that the conclusion that Thomas would or would not be able to work is reserved to the Commissioner.

Id.  The ALJ also stated that Dr. Ponieman's records did not support his conclusion that Thomas was unable to work, noting for example, that Dr. Ponieman's records showed that Thomas either "specifically denied fatigue or her review of systems was unremarkable or within normal limits." Id.

The ALJ considered the mental residual functional capacity assessment conducted by state agency medical consultant Dr. Edward Kamin, who found that Thomas had "mild limitations in activities of daily living and moderate restrictions in maintaining social and concentration, persistence, and pace" and gave that assessment considerable weight.  R. 15.

Thomas was seen by Dr. Ramon Ravelo between May and October 2015 for depression and anxiety treatment.  R. 16.  Dr. Ravelo indicated that Thomas had no gross mental abnormalities, but also diagnosed her with major depressive disorder and prescribed medication. Id.  Dr. Ravelo filled out a medical source statement on July 1, 2015, in which he assigned Thomas a "GAF score of 55."  Id.[3]  Thomas continued to see Dr. Ravelo between May 2016 and April 2017, and Dr. Ravelo completed an additional mental impairment questionnaire on April 21, 2017.  R. 16-17.  That questionnaire diagnosed Thomas with major depressive disorder that

_____

[3]  A GAF, or "global assessment of functioning," score is a scale that was "promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'"  Kohler v. Astrue, 546 F.3d 260, 262 n.1 (2d Cir. 2008) (alterations in original) (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders ("DSM") 32 (4th ed. 2000)).  "A GAF between 51 and 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers)."  Id. (citations, alteration, and internal quotation marks omitted).  "GAF scores may be relevant to an ALJ's severity and RFC determinations, although they are intended to be used to make treatment decisions . . . and not disability determinations."  Gonzalez v. Colvin, 2016 WL 4009532, at *5 (W.D.N.Y. July 27, 2016) (alteration in original) (internal quotation marks and citation omitted).  The Fifth Edition of the DSM, published in 2013, stopped using the GAF scale.  See Kaczkowski v. Colvin, 2016 WL 5922768, at *12 n.5 (S.D.N.Y. Oct. 11, 2016).

was in partial remission as well as bipolar disorder.  R. 17.  The ALJ gave little weight to Dr.

Ravelo's findings, stating that Dr. Ravelo's opinion that Thomas would be absent from work

more than three times per month and that Thomas had marked limitations in understanding,

remembering, and carrying out instructions did not comport with Dr. Ravelo's own treatment

notes.  R. 19.  The ALJ also found Dr. Ravelo's conclusions to be internally inconsistent.  Id.

Specifically, the ALJ stated Dr. Ravelo's finding that Thomas's ability to respond appropriately

to her supervisors was not affected by her impairments conflicted with his opinion that Thomas

had limitations in several abilities under that category.  Id.

Thomas underwent a psychiatric evaluation by Dr. W. Amory Carr on July 6, 2017.

R. 17.  The examination noted "a dysthymic mood, slightly dysphoric and somewhat sedated

affect, and impaired attention and concentration and recent and remote memory skills."  R. 17-

18.  Dr. Carr diagnosed Thomas with major depressive disorder and an unspecified anxiety

disorder.  R. 18.  Dr. Carr opined that Thomas had mild to moderate limitations in maintaining

personal hygiene and having awareness of normal hazards, and moderate limitations in

concentration and understanding others.  Id.  Dr. Carr also opined that Thomas had moderate to

marked restrictions in using reason and judgment and regulating her emotions.  Id.  Dr. Carr

concluded Thomas's psychiatric problems would significantly interfere with her ability to

function on a daily basis.  Id.  Dr. Carr also completed a medical source statement of Thomas's

ability to do work-related activities.  Id.  Dr. Carr opined that Thomas was moderately limited in

understanding and carrying out complex instructions and interacting appropriately with

coworkers.  Id.  Dr. Carr also stated that Thomas was mildly limited in interacting with

supervisors and responding to work situations and changes in a routine work setting.  Id.  The

ALJ found that Dr. Carr "overstates some of the claimant's mental capabilities" — presumably

meaning "limitations"— because they were "not supported by Dr. Ravelo's mostly benign mental status exams."  R. 19.  The ALJ also noted that there was "little support" for Dr. Carr's finding that Thomas's "mental impairments would significantly interfere with her ability to function on a daily basis since she was capable of caring for her personal hygiene, performing household chores, and going to work on a sustained basis."  Id.

At step four, the ALJ concluded that Thomas was unable to perform any past relevant work.  R. 20.  Specifically, the ALJ concluded Thomas could no longer work as a home attendant, hair stylist, or child monitor.  Id.  However, at step five, the ALJ concluded that jobs existed in significant numbers in the national economy that Thomas could perform.  Id. Specifically, the ALJ concluded Thomas could work as a deliverer, document preparer, or machine collector based on the testimony of the vocational expert.  R. 21.  Accordingly, the ALJ concluded that Thomas was not disabled under the Act.  Id.

## II.  GOVERNING STANDARDS OF LAW

### A.  Scope of Judicial Review Under 42 U.S.C. § 405(g)

It is not a reviewing court's function "to determine de novo whether [a claimant] is disabled."  Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998) (citation and internal quotation marks omitted); accord Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 122 (2d Cir. 2012).  Rather, a court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard."  Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (citations and internal quotation marks omitted); accord Greek v. Colvin, 802 F.3d 370, 374-75 (2d Cir. 2015) (per curiam); see generally 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be

11

conclusive . . . ."). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); accord Greek, 802 F.3d at 375; Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir. 2008); Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000). The "threshold for such evidentiary sufficiency is not high." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (citation and internal quotation marks omitted). Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)). The Second Circuit has characterized the substantial evidence standard as "a very deferential standard of review — even more so than the 'clearly erroneous' standard." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam). "The substantial evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." Id. (emphasis in original) (citations and internal quotation marks omitted). "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision." Johnson, 563 F. Supp. 2d at 454 (citation and internal quotation marks omitted).

   B. Standard Governing Evaluation of Disability Claims by the Agency

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); see id. § 1382c(a)(3)(A).  A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam); accord Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam); Craig v. Comm'r of Soc. Sec., 218 F. Supp. 3d 249, 260 (S.D.N.Y. 2016).

Regulations issued pursuant to the Act set forth a five-step process that the Commissioner must use in evaluating a disability claim.  See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Burgess, 537 F.3d at 120 (describing the five-step process).  First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity."  20 C.F.R. §§ 404.1520(a)(4)(I), 416.920(a)(4)(I).  Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," id. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities," id. §§ 404.1520(c),

416.920(c).  Third, if the claimant's impairment is severe and is listed in 20 C.F.R. Part 404,

Subpart P, Appendix 1, or is equivalent to one of the listed impairments, the claimant must be

found disabled regardless of his age, education, or work experience.  See id.

§§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d).  Fourth, if the claimant's

impairment is not listed and is not equal to one of the listed impairments, the Commissioner must

review the claimant's RFC to determine if the claimant is able to do work he or she has done in

the past, i.e., "past relevant work."  Id. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If the claimant

is able to do such work, he or she is not disabled.  Id. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if

the claimant's RFC, in addition to his or her age, education, and work experience, permits the

claimant to do other work.  Id. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If the claimant cannot

perform other work, he or she will be deemed disabled.  Id. §§ 404.1520(a)(4)(v),

416.920(a)(4)(v).  The claimant bears the burden of proof on all steps except the final one — that

is, proving that there is other work the claimant can perform.  See Poupore v. Astrue, 566 F.3d

303, 306 (2d Cir. 2009) (per curiam).

C.  The "Treating Physician" Rule

Under the so-called "treating physician" rule, the ALJ must generally give "more weight

to medical opinions" from a claimant's "treating source" — as defined in the regulations —

when determining if the claimant is disabled.  See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).[4]

Treating sources, which include some professionals other than physicians, see id.

§§ 404.1527(a)(2), 416.927(a)(2), "may bring a unique perspective to the medical evidence that

---

[4]  Although the SSA has since revised its rules to eliminate the treating physician rule,
because the claim here was filed before March 27, 2017, the rule applies in this case.  See, e.g.,

cannot be obtained from the objective medical findings alone or from reports of individual

examinations, such as consultative examinations," id. §§ 404.1527(c)(2), 416.927(c)(2).  The

Second Circuit has summarized the deference that must be accorded the opinion of a "treating

source" as follows:

> Social Security Administration regulations, as well as our precedent, mandate specific procedures that an ALJ must follow in determining the appropriate weight to assign a treating physician's opinion.  First, the ALJ must decide whether the opinion is entitled to controlling weight.  "[T]he opinion of a claimant's treating physician as to the nature and severity of [an] impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'"  Burgess, 537 F.3d at 128 (third brackets in original) (quoting 20 C.F.R. § 404.1527(c)(2)).  Second, if the ALJ decides the opinion is not entitled to controlling weight, it must determine how much weight, if any, to give it.  In doing so, it must "explicitly consider" the following, nonexclusive "Burgess factors": "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist."  Selian[, 708 F.3d at 418] (citing Burgess, 537 F.3d at 129 (citing 20 C.F.R. § 404.1527(c)(2))).  At both steps, the ALJ must "give good reasons in [its] notice of determination or decision for the weight [it gives the] treating source's [medical] opinion."  Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam) (quoting 20 C.F.R. § 404.1527(c)(2)) . . . .  An ALJ's failure to "explicitly" apply the Burgess factors when assigning weight at step two is a procedural error.  Selian, 708 F.3d at 419-20.

Estrella v. Berryhill, 925 F.3d 90, 95-96 (2d Cir. 2019).  Accordingly, the Second Circuit has

stated that it will "not hesitate to remand when the Commissioner has not provided 'good

reasons' for the weight given to a treating physician[']s opinion and [it] will continue remanding

when [it] encounter[s] opinions from ALJ[s] that do not comprehensively set forth reasons for

the weight assigned to a treating physician's opinion."  Halloran, 362 F.3d at 33; accord Estrella,

925 F.3d at 96; see also Greek, 802 F.3d at 375-77.

---

Conetta v. Berryhill, 365 F. Supp. 3d 383, 395 n.5 (S.D.N.Y. 2019).

Nonetheless, the Commissioner is not required to give deference to a treating physician's opinion where the treating physician "issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." Halloran, 362 F.3d at 32 (citation omitted). In fact, "the less consistent [a treating physician's] opinion is with the record as a whole, the less weight it will be given." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (citing 20 C.F.R. § 404.1527(d)(4)); see also Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve.") (citation omitted). Finally, a "slavish recitation of each and every [factor listed in 20 C.F.R. § 404.1527(c)]" is unnecessary "where the ALJ's reasoning and adherence to the regulation are clear," Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order) (citing Halloran, 362 F.3d at 31-32), and even where the ALJ fails to explicitly apply the "Burgess factors," a court may, after undertaking a "'searching review of the record,'" elect to affirm the decision if "'the substance of the treating physician rule was not traversed.'" Estrella, 925 F.3d at 96 (quoting Halloran, 362 F.3d at 32).

D. Credibility Determinations

"It is the function of the [Commissioner], not [the reviewing court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983) (citing Perales, 402 U.S. at 399) (additional citations omitted). Thus, the ALJ, "after weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility . . . may decide to discredit the claimant's subjective estimation of the degree of impairment." Tejada v. Apfel, 167 F.3d 770, 775-76 (2d Cir. 1999) (summarizing the holding of and citing with approval Pascariello v. Heckler, 621 F. Supp. 1032, 1036 (S.D.N.Y. 1985)). Nonetheless, when discounting a claimant's credibility

16

regarding his or her residual functional capacity, regulations impose some burden on the ALJ to

explain his or her decision.  As the Second Circuit has stated:

> When determining a claimant's RFC, the ALJ is required to take the claimant's
> reports of pain and other limitations into account, 20 C.F.R. § 416.929; see
> McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701, 704-05 (2d Cir.
> 1980), but is not required to accept the claimant's subjective complaints without
> question; he may exercise discretion in weighing the credibility of the claimant's
> testimony in light of the other evidence in the record.  Marcus v. Califano, 615
> F.2d 23, 27 (2d Cir. 1979).

Genier, 606 F.3d at 49; see also 20 C.F.R. § 404.1529.  To evaluate a claimant's assertion of a

limitation, the ALJ must engage in a two-step process:

> At the first step, the ALJ must decide whether the claimant suffers from a
> medically determinable impairment that could reasonably be expected to produce
> the symptoms alleged.  20 C.F.R. § 404.1529(b).  That requirement stems from
> the fact that subjective assertions of pain alone cannot ground a finding of
> disability.  20 C.F.R. § 404.1529(a).  If the claimant does suffer from such an
> impairment, at the second step, the ALJ must consider "the extent to which [the
> claimant's] symptoms can reasonably be accepted as consistent with the objective
> medical evidence and other evidence" of record.  Id.  The ALJ must consider
> "[s]tatements [the claimant] or others make about [her] impairment(s), [her]
> restrictions, [her] daily activities, [her] efforts to work, or any other relevant
> statements [she] make[s] to medical sources during the course of examination or
> treatment, or to [the agency] during interviews, on applications, in letters, and in
> testimony in [its] administrative proceedings."  20 C.F.R. § 404.1512(b)(3); see
> also 20 C.F.R. § 404.1529(a); S.S.R. 96-7p.

Genier, 606 F.3d at 49 (alterations and emphasis in original).

The SSA has issued regulations relating to reports of pain or other symptoms affecting

the ability to work by a claimant for disability benefits.  20 C.F.R. § 404.1529(c).  These

regulations provide, inter alia, that the SSA "will not reject [a claimant's] statements about the

intensity and persistence of [her] pain or other symptoms or about the effect [her] symptoms

have on [her] ability to work solely because the available objective medical evidence does not

substantiate [her] statements."  Id. § 404.1529(c)(2).  The regulations also provide that the SSA

17

"will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [a claimant's] statements and the rest of the evidence." Id. § 404.1529(c)(4).

Where an ALJ rejects witness testimony as not credible, the basis for the finding "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988) (citing Carroll, 705 F.2d at 643); accord Craig, 218 F. Supp. 3d at 263. The ALJ must make this determination "in light of medical findings and other evidence[ ] regarding the true extent of the pain alleged by the claimant." Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir. 1984) (internal quotation marks omitted) (quoting McLaughlin, 612 F.2d at 705). However, where an ALJ gives specific reasons for finding the claimant not credible, the ALJ's credibility determination "is generally entitled to deference on appeal." Selian, 708 F.3d at 420 (citing Calabrese v. Astrue, 358 F. App'x 274, 277 (2d Cir. 2009) (summary order)). Thus, "[i]f the [Commissioner's] findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints." Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) (internal citations omitted); see also 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").

III.  DISCUSSION

Thomas argues that the ALJ failed to properly weigh the medical opinion evidence and, as a result, failed to properly determine Thomas's RFC. Pl. Mem. at 10-18; Pl. Reply at 1-6. Thomas also argues that the ALJ failed to properly evaluate Thomas's testimony at the hearing. Pl. Mem. at 18-22. Thomas only takes issue with the mental aspects of her RFC. Accordingly,

our analysis is confined to a discussion of Thomas's mental impairments.

    A.  <u>Whether the ALJ Properly Weighed the Medical Evidence in Determining Thomas's RFC</u>

A claimant's RFC is "the most [a claimant] can still do despite [his or her] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  The RFC is a "function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8p, 1996 WL 374184, at *3 (S.S.A. July 2, 1996).  The SSA has stated that "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis."  <u>Id.</u> at *1; <u>accord</u> <u>Ferraris v. Heckler</u>, 728 F.2d 582, 585 (2d Cir. 1984) ("[I]n making any determination as to a claimant's disability, the Secretary must explain what physical functions the claimant is capable of performing.") (citations omitted).  In determining a claimant's RFC, an ALJ weighs the opinions of physicians who have treated or examined the claimant along with other evidence in the record. <u>See</u>, <u>e.g.</u>, <u>Distefano v. Berryhill</u>, 363 F. Supp. 3d 453, 471 (S.D.N.Y. 2019).

    Dr. Ravelo is a psychiatrist, R. 332, who saw Thomas multiple times between May 2015 and April 2017, R. 327-336, 455-468, and thus is a treating "medical source" under the regulations, <u>see</u> 20 C.F.R. §§ 404.1513(a), 404.1527(a)(2), 416.913(a), 416.927(a)(2). Accordingly, Dr. Ravelo's opinions were entitled to controlling weight in the ALJ's calculation of Thomas's RFC if they were "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [ ] not inconsistent with the other substantial evidence in [the claimant's] case record."  <u>See id.</u> §§ 404.1527(c)(2), 416.927(c)(2).  Here, the ALJ gave little weight to the opinions of Thomas's treating physician, Dr. Ravelo, in determining Thomas's RFC in part because he found Dr. Ravelo's opinions were not supported by his own treatment

notes as well as the longitudinal medical evidence.  R. 19.

We start by addressing an issue raised by Thomas regarding one of the forms filled out by Dr. Ravelo that opined on Thomas's limitations.  The ALJ noted, R. 19, that Dr. Ravelo opined that Thomas's ability to respond appropriately to supervision would not be impaired by her mental limitations, but Dr. Ravelo went on to enumerate impairments to several abilities in that category and concluded Thomas had several marked difficulties in that domain.  See R. 329-30 (Dr. Ravelo's Medical Assessment Form).  This came about because Dr. Ravelo checked the "no" box as to whether Thomas had problems with "supervision, coworkers and pressure in a work setting" but then checked off several boxes reflecting "marked limitations" within this subject area.  Id.  We agree with plaintiff that Dr. Ravelo surely meant to opine that Thomas had the marked limitations he checked and that if he had it to over again, he would have checked the "yes" box indicating limitations in this domain.  Pl Mem. at 14-15.  Thus, if the ALJ had concluded that Dr. Ravelo actually intended — notwithstanding the multiple check marks — to find no limitations in this domain, we would find that the ALJ had not properly interpreted Dr. Ravelo's questionnaire.

But the ALJ never drew such a conclusion from the form Dr. Ravelo filled out.  The ALJ merely noted the inconsistency and said it supported his decision to reject Dr. Ravelo's opinion. R. 19.  We agree with Thomas that the inconsistency would provide little support for a rejection of Dr. Ravelo's opinion, inasmuch as the cavalier manner in which Dr. Ravelo filled out the form would not justify fully discounting his opinion.  But the ALJ went on to find that it was "[m]ore significant[]" that Dr. Ravelo's opinion was not consistent with his own treatment record and the medical record as a whole.  Id.  Given that the ALJ placed the greatest emphasis on these problems, we do not view the ALJ as having committed any error with respect to his

20

characterization of Dr. Ravelo's completion of the form.

As to the inconsistency with Dr. Ravelo's records, Dr. Ravelo's treatment records do not support a finding of marked impairment in either the understand-and-carry-out-instructions category or the respond-appropriately-to-supervision category.  In an April 2017 record, Dr. Ravelo stated that while Thomas exhibited "signs of anxiety," her "behavior in the session was cooperative and attentive with no gross behavioral abnormalities."  R. 461 (April 21, 2017, session).  Earlier that year, Dr. Ravelo also stated Thomas had "no signs of depression" and there were "no signs of thought disorder."  R. 462 (January 17, 2017, session).  In October 2016, Dr. Ravelo noted "Thomas's behavior has been stable and uneventful and she denies any psychiatric problems or symptoms."  R. 463 (October 3, 2016, session).  In a September 30, 2016, session, Dr. Ravelo observed "Thomas's behavior in the session was cooperative and attentive with no gross behavioral abnormalities."  R. 464.  In an August 29, 2016, session "Thomas . . . denie[d] any psychiatric problems or symptoms.  Her behavior [was] appropriate and uneventful." R. 465.  There were "no signs of depression" on July 1, 2016, and Thomas denied "all psychiatric problems."  R. 466.  During a May 13, 2016, session, Dr. Ravelo noted Thomas appeared "angry" and "anxious" but that there were "no signs of hyperactive or attentional difficulties."  R. 467.   Certainly, there are some notes indicating difficulties in areas of thinking and concentration.  See R. 332-36.  However, in light of the evidence in the record, including Dr. Ravelo's treatment notes cited above, the ALJ was entitled to conclude that they did not support a finding of "marked" limitations.  See, e.g., R. 437 (Thomas reported not feeling down, depressed, or hopeless on May 24, 2016); R. 445 (same on June 23, 2016); R. 447 (same on August 10, 2016); R. 449 (same on January 10, 2017); R. 472 (Thomas exhibited "no signs of hyperactive or attentional difficulties" on May 27, 2015); R. 473 ("A normal attention span is in

21

evidence and [Thomas] exhibit[ed] no signs of hyperactivity" on June 25, 2015); R. 474 ("There [were] no signs of hyperactive or attentional difficulties" on August 15, 2015); R. 475 (same on October 14, 2015).

In the end, the ALJ could view Dr. Ravelo's own treatment record as not supporting his opinion that Thomas would be absent from work more than three times per month, had marked limitations in several abilities related to understanding and carrying out instructions, and had marked limitations in abilities related to responding appropriately to supervision. See Monroe v. Comm'r of Soc. Sec., 676 F. App'x 5, 8-9 (2d Cir. 2017) (summary order) ("Because the ALJ reached her RFC determination based on [treating physician]'s contemporaneous treatment notes — while at the same time rejecting his post hoc medical opinion ostensibly based on the observations memorialized in those notes — that determination was adequately supported by more than a mere scintilla of evidence."); Camille v. Colvin, 652 F. App'x 25, 27 (2d Cir. 2016) (summary order) ("Substantial evidence supports the limited weight that the ALJ attributed [treating physician's] opinions, because they were in conflict with content in that doctor's own clinical notes.").

As to the medical record as a whole, the State Agency psychologist, Dr. Kamin, reviewed the record and determined that Thomas had only moderate limitations in her ability to understand, remember, and carry out detailed instructions. R. 74-75. Dr. Kamin also found that Thomas had no limitation in interacting with supervisors. R. 75. Consulting Psychologist Dr. Carr similarly opined that Thomas had only moderate limitations with regard to understanding, remembering, and carrying out instructions as well as only moderate limitations in interacting with supervisors, though he found marked limitations in other areas. R. 491. Additionally, though not necessarily indicative of Thomas's ability to carry out instructions, Dr. Ponieman's

22

records indicated that Thomas reported she did not feel depressed on May 24, 2016, R. 437; June 23, 2016, R. 445; August 10, 2016, R. 447; and January 10, 2017, R. 449.  Thus, because the medical record as a whole contradicts Dr. Ravelo's finding of marked limitations in the category of understanding, remembering, and carrying out instructions, as well as the category of interacting with supervisors, the ALJ could properly use this fact as a justification for not giving those findings controlling weight.[5]  See Halloran, 362 F.3d at 32 ("[T]he opinion of the treating physician is not afforded controlling weight where" it is "not consistent with other substantial evidence in the record, such as the opinions of other medical experts.").

In the end, the lack of consistency between the medical record as a whole and Dr. Ravelo's treatment notes on the one hand and Dr. Ravelo's opinion regarding Thomas's limitations on the other, provide sufficient "good reasons" to not give the treating physician's opinions controlling weight.  See Vanterpool v. Colvin, 2014 WL 1979925, at *14-15 (S.D.N.Y. May 15, 2014); accord Heitz v. Comm'r of Soc. Sec., 201 F. Supp. 3d 413, 423-24 (S.D.N.Y. 2016) (ALJ had "good reasons" to reject treating physician's opinion on the ground that the opinion was "internally inconsistent and contradicted by other medical evidence in the record.").

Thomas argues that even though there were periods of improvement and stability with treatment, those points in time were followed by increases in the seriousness of her symptoms. Pl. Mem. at 12.  Thomas cites several cases for the proposition that positive response to treatment does not necessarily mean that the patient has recovered to a point that he or she is not

---

[5]  In addition to the July 1, 2015, medical source statement, R. 327-31, Dr. Ravelo filled out an additional medical impairment questionnaire on April 21, 2017, R. 455-59.  Because the April 21 questionnaire makes substantially identical findings to Dr. Ravelo's previous medical source statement, e.g., marked limitations in carrying out instructions and interacting with supervisors, the ALJ could decline to give it controlling weight here for the reasons already discussed.

disabled as defined in the Act.  See id. at 13-14.  But the disconnect between Dr. Ravelo's

medical treatment notes, R. 335-36, 455-75, and his medical source statement, R. 327-31, is far

greater than the disconnect that was present in the cases cited by Thomas because the cited cases

involved claimants who continued to experience debilitating symptoms.  See Scott v. Astrue, 647

F.3d 734, 737 (7th Cir. 2011) (treating physician "observed that [plaintiff] was guarded, spoke

quietly and slowly, had poor recall and concentration, and was easily distracted."); Bauer v.

Astrue, 532 F.3d 606, 608-09 (7th Cir. 2008) (Plaintiff was "heavily medicated," there was

"uncontradicted evidence that the plaintiff's son cooks most meals, washes the dishes, does the

laundry, and helps with the grocery shopping," and treating physician's treatment notes backed

up "the report in which [the treating physician] concludes that the plaintiff cannot work full

time."); Morales v. Apfel, 225 F.3d 310, 319 (3d Cir. 2000) ("Other information in the treatment

records" supported treating physician's opinion that claimant's "mental impairment rendered him

markedly limited in a number of relevant work-related activities."); Gude v. Sullivan, 956 F.2d

791, 793 (8th Cir. 1992) (treating physician's "letter stated that [claimant] has continued to

experience precisely the symptoms she related during her hearing testimony, and it characterized

[claimant's] present symptoms as significant.").

Here, the medical record does not indicate that Thomas had such debilitating symptoms.

Indeed, on many occasions, the record indicates that Thomas consistently had no "attentional

difficulties" and "no gross behavioral abnormalities."  R. 461-75.  Thus, because Dr. Ravelo's

finding of marked limitations conflicted with almost the entirety of his own treatment notes, the

ALJ identified sufficient "good reasons" to not give controlling weight to Dr. Ravelo's findings.

This does not mean the Court would necessarily have come to the same conclusion.  But to the

extent the evidence is "susceptible to more than one rational interpretation, then the

Commissioner's conclusion must be upheld." Weather v. Astrue, 32 F. Supp. 3d 363, 368 (N.D.N.Y. 2012) (citing Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982)).

Thomas takes issue with the ALJ's consideration of the factors described in 20 C.F.R. §§ 404.1527(c), 416.927(c) relevant to determining the weight to give to Dr. Ravelo's opinions, asserting that the ALJ "gave short-shrift" to those factors.  Pl. Mem. at 15-16.  However, as already discussed, the ALJ properly considered the "supportability" and "consistency" of Dr. Ravelo's opinions, which are two of the relevant 20 C.F.R. §§ 404.1527(c), 416.927(c) factors. The fact that the ALJ did not explicitly address each of the factors is of no consequence because a "slavish recitation of each and every factor" is unnecessary "where the ALJ's reasoning and adherence to the regulation are clear."  Atwater, 512 F. App'x at 70 (citing Halloran, 362 F.3d at 31-32).

Thomas also argues that the ALJ failed to give proper weight to opinions of the consultative examiner, Dr. Carr.  Pl. Mem. at 16-17.  Dr. Carr found that Thomas had marked limitations in some abilities related to carrying out instructions and moderate limitations in activities related to interacting with supervisors.  R. 493-94.  Dr. Carr's findings of primarily moderate or lesser limitation are generally consistent with the ALJ's RFC determination.  See R. 14 (ALJ's RFC determination); R. 493-94 (Dr. Carr's findings of primarily moderate or lesser limitations).  However, for the same reason we hold that Dr. Ravelo's finding of marked limitations in the carrying out instructions category is entitled to lesser weight — namely, that a finding of marked impairment does not comport with Dr. Ravelo's treatment notes — there was substantial evidence that allowed the ALJ to choose not to accept Dr. Carr's finding of marked limitations in several activities related to carrying out instructions.

Thomas argues that the ALJ erred in finding that Thomas was "'capable of caring for her

personal hygiene, performing household chores, and going to work on a sustained basis.'"  Pl.

Mem. at 16-17 (quoting R. 19).  As to the issue of hygiene and performing household chores,

there was substantial evidence in the record to support that finding even if Thomas sometimes

experienced lapses.  See R. 54 (Thomas cared for her personal hygiene and did household

chores); R. 269 (Thomas "is able to shower, dress, and bathe herself" and she "can cook

approximately three times per week, cleaning, laundry, and shopping approximately one time per

week."); R. 486 (Dr. Archbald's July 6, 2017, opinion that Thomas could care for her personal

hygiene); R. 491 (Dr. Carr's July 6, 2017, opinion that Thomas could "maintain personal hygiene

with mild to moderate limitation").

Thomas argues that there was no evidence that she worked on a sustained basis "after her

onset," Pl. Mem. at 16, and that the ALJ must have "confused" Thomas with someone else, id. at

17.  But the ALJ did not make a finding that Thomas worked after her onset and, indeed, his

opinion specifically notes Thomas had not engaged in substantial gainful activity since her

application date, July 22, 2014, which was just weeks after her alleged onset date.  R. 12.  He

also noted that she had "describe[d] her prior work history" during her testimony, which was

clear that she had not worked after her onset date, R. 55, and the ALJ accurately summarized her

past employment, R. 13, 20.  Thus, we have no reason to believe that the ALJ did not consider

the timing of her employment.  The ALJ's statement regarding Thomas's going to work,

however, was supported by the fact that during a period prior to her onset date — when Thomas

was seeing providers for depression and anxiety — Thomas continuously worked as a home

health aide.  See R. 212 (Thomas worked as a home health aide from July 1, 2013 until June 1,

2014); R. 259-265 (Dr. Hayden's treatment records from February 4, 2014 to May 21, 2014);

R. 324-25 (Dr. Hayden's treatment records from January 6, 2014); R. 390-404 (Dr. Ponieman's

treatment records from July 17, 2013 to March 25, 2014).

Accordingly, we find that substantial evidence existed in the record to support the ALJ's decision to discount portions of Dr. Carr's findings.

Finally, Thomas argues that the ALJ failed to cite to specific medical facts or non-medical evidence to support the mental RFC determination for Thomas.  Pl. Mem. at 17-18.  But an ALJ is "entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole" even where "the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision."  Matta v. Astrue, 508 F. App'x 53, 56 (2d Cir. 2013); accord Tankisi v. Comm'r of Soc. Sec., 521 F. App'x 29, 34 (2d Cir. 2013) (summary order) (where "the record contains sufficient evidence from which an ALJ can assess . . . residual functional capacity," a formal medical opinion is not necessarily required); Pellam v. Astrue, 508 F. App'x 87, 90 (2d Cir. 2013) (summary order) (upholding RFC determination where the ALJ "rejected" physician's opinion but relied on physician's findings and treatment notes to establish RFC).  Accordingly, the ALJ's RFC determination is supported by substantial evidence in the record.[6]  For the same reason, we also reject Thomas's argument, Pl. Reply at 4, that the ALJ relied on his lay judgments rather than medical opinions in arriving at Thomas's RFC.  See Johnson v. Colvin, 669 F. App'x 44, 46-47 (2d Cir. 2016)

---

[6] Because we find that Dr. Ravelo's treatment notes constitute substantial evidence to support the ALJ's RFC determination, it is not necessary to address Thomas's argument that the ALJ erred by relying on the opinions from non-examining state agency medical consultant Dr. Edward Kamin.  Pl. Reply at 4-6.  In any event, an ALJ "is permitted to conclude that the opinion of a treating source should be given less weight than that of a non-examining source, if the opinion of the non-examining source is more consistent with the records as a whole."  Wright v. Colvin, 2017 WL 202171, at *6 (D. Conn. Jan. 18, 2017) (citing Camille v. Colvin, 104 F. Supp. 3d 329, 343 (W.D.N.Y. 2015), aff'd, 652 F. App'x 25 (2d Cir. 2016) (summary order)); accord Suttles v. Colvin, 654 F. App'x 44, 46 (2d Cir. 2016) (summary order) (no error by ALJ to give great weight to consultative examiner's opinion because it was consistent with record

("[B]ecause the record contained sufficient [ ] evidence supporting the ALJ's determination and because the ALJ weighed all of that evidence when making his residual functional capacity finding, there was no 'gap' in the record and the ALJ did not rely on his own 'lay opinion.'") (citations omitted); see also Graham v. Berryhill, 397 F. Supp. 3d 541, 556 (S.D.N.Y. 2019) ("We are aware of no case law or other principle that requires that the record contain a statement by a medical professional that a claimant lacks restrictions before an ALJ may find that the restrictions asserted by a claimant are not supported by substantial evidence.").

B. The ALJ Properly Considered Thomas's Hearing Testimony

Thomas argues the ALJ erroneously concluded that, although Thomas's impairments could reasonably be expected to cause the alleged symptoms, Thomas's statements about the intensity, persistence, and limiting effects of those symptoms was not entirely consistent with the medical evidence. Pl. Mem. at 19 (citing R. 18). Specifically, Thomas argues the ALJ mischaracterized her mental status examination results as "benign," id.; misdefined her treatment as conservative, id. at 20; and improperly discounted her testimony because she discontinued therapy after a few sessions, id. at 21.

We reject Thomas's first argument here for the same reasons we rejected it in section III.A, above. As to her second argument, the ALJ stated that Thomas had never been psychiatrically hospitalized and denied having any psychiatric limitations at her more recent psychiatric follow-up exams. R. 18. Thus, the ALJ concluded, Thomas's treatment had been "essentially routine and/or conservative in nature." Id. A conservative treatment regimen, when combined with other similarly conflicting evidence in the record, is substantial evidence sufficient to discount a claimant's statements about the severity of their symptoms. See Burgess,

---

evidence).

28

537 F.3d at 129 (fact that plaintiff is subject to conservative treatment routine to "alleviate her pain may [ ] help to support the Commissioner's conclusion that the claimant is not disabled if that fact is accompanied by other substantial evidence in the record."); Guerrero v. Colvin, 2016 WL 7339114, at *16 (S.D.N.Y. Dec. 19, 2016) (Substantial evidence supported discounting of claimant's testimony where the "ALJ . . . noted that [claimant's] testimony regarding the severity of her symptoms conflicted with her conservative courses of treatment."), adopted by 2017 WL 4084051 (S.D.N.Y. Sept. 13, 2017).

Thomas takes issue with the ALJ's characterization of her treatment as "conservative," correctly noting that a lack of hospitalization is not evidence of a lack of disability.  Pl. Mem. at 21 (citing Voigt v. Colvin, 781 F.3d 871, 876 (7th Cir. 2015) and Adkins v. Astrue, 2010 WL 3782388, at *9 (N.D. Ind. Sept. 21, 2010)).  Additionally, Thomas argues that the ALJ improperly categorized her treatment as conservative, given that she was prescribed behavior altering medications.  Id. at 20 (citing Burgess, 537 F.3d at 129 and Baker v. Astrue, 2010 WL 682263, at *1 (C.D. Cal. Feb. 24, 2010)).

The term "conservative" is perhaps susceptible to differing interpretations.  What matters, however, is whether the nature of Thomas's treatment, as reflected in Dr. Ravelo's notes, constituted substantial evidence supporting the ALJ's decision to discount Thomas's hearing testimony as to her impairments.  See Selimaj v. Berryhill, 2019 WL 1417050, at *9 (S.D.N.Y. Mar. 29, 2019) ("Even if Plaintiff's treatment was not considered 'conservative,' this finding would not be outcome-determinative in light of the substantial evidence in the record which supports the ALJ's determination that Plaintiff is not as severely impaired as he alleges.").  In the context of a medical opinion, courts have found substantial evidence to support an ALJ's decision to discount an opinion where the opinion was "not supported by the . . . treatment

29

progress notes[,] which show that the claimant's condition was stable from conservative treatment with medication and therapy."  Callanan v. Astrue, 2011 WL 589906, at *4 (E.D.N.Y. Feb. 10, 2011) (citation and internal quotation marks omitted).  The same principle logically applies to a claimant's testimony.  Thus, cases have specifically recognized that "[a] pattern of conservative medical treatment," such as mental health treatment "with medication and therapy" but not "in-patient or hospitalization care," "is a proper factor for an ALJ to consider in evaluating a claimant's credibility."  Reyna v. Comm'r of Soc. Sec., 2019 WL 4415142, at *6 (W.D.N.Y. Sept. 16, 2019); see also Corbett v. Saul, 2019 WL 4793043, at *5 (M.D. Pa. Sept. 10, 2019) (fact that claimant "generally requires use of psychotropic medication and outpatient psychiatric services" and her "progress notes show improvement" suggested "that her symptoms can be managed with conservative treatment" and that claimant was not disabled), adopted by 2019 WL 4750341 (M.D. Pa. Sept. 30, 2019); Selimaj, 2019 WL 1417050, at *9 (fact that plaintiff was prescribed medication rather than hospitalized "would indicate that Dr. Charles' prescription of [a strong antipsychotic] was a conservative treatment as opposed to a more aggressive treatment.").  And while Thomas cites to sources indicating that one of her prescribed medications can cause a serious side-effect called "tardive dyskinesia," Pl. Mem. at 20, Thomas repeatedly denied having side-effects from her medication, see R. 253, 255, 259, 310, 462-63; see also Selimaj, 2019 WL 1417050, at *9 (fact that plaintiff was "prescribed Haldol, a strong antipsychotic that can potentially cause severe side effects" did not mean treatment was not conservative where there was no "indication that Plaintiff suffered from tardive dyskinesia, which is a potential side effect of the medications.").

Finally, Thomas argues the ALJ improperly considered the fact that Thomas discontinued therapy after a few sessions.  Pl. Mem. at 21 (citing R. 18).  Under SSR 16-3P, the ALJ is

required to consider a claimant's mental impairments when considering their treatment history,

because "an individual may not be aware that he or she has a disorder that requires treatment."

See Greene v. Berryhill, 2018 WL 8646666, at *8 (D. Conn. Aug. 10, 2018) ("[T]he ALJ may

need to ask the claimant why she 'has not complied with or sought treatment in a manner

consistent with his or her complaints.'") (quoting SSR 16-3p).  Here, the ALJ specifically

inquired why Thomas had discontinued treatment during the hearing.

> Q. And when you saw [your therapist], you got along with her?
>
> A. No.
>
> Q. What was the problem there?
>
> A. For me it brings out a lot of depression.  It, it completely makes me relive the time — all the time I was fighting in court with my daughter.  It brings me to a dark place because sitting there talking about that episode all the time, I'm not coming out of there happy, I'm coming out of there depressed and sad.  So —

R. 45-46.  Thus, this is not a case where the ALJ either 1) failed to inquire about why the

claimant had discontinued treatment or failed to seek treatment in the first place or 2) discounted

evidence where the claimant had a valid reason for not seeking or continuing treatment, such as

an inability to afford treatment.  See Pate-Fires v. Astrue, 564 F.3d 935, 946 (8th Cir. 2009) ("the

evidence overwhelmingly demonstrates [claimant's] noncompliance was attributable to her

mental illness."); Regennitter v. Comm'r of Soc. Sec. Admin., 166 F.3d 1294, 1299 (9th Cir.

1999) ("Nor is [claimant's] failure, because of his poverty, to seek 'treatment by any mental

professional' a valid reason for the ALJ to reject [doctor's] opinion.").  Accordingly, the ALJ

properly considered Thomas's treatment history, as one of multiple factors, in reaching the

decision to discount Thomas's statements about the severity of her symptoms.

IV.  <u>CONCLUSION</u>

For the foregoing reasons, Thomas's motion for judgment on the pleadings (Docket # 17)

is denied and the Commissioner's motion for judgment on the pleadings (Docket # 19) is

granted.  The Clerk is requested to enter judgment and to close this case.

SO ORDERED.

Dated:  New York, New York
        August 18, 2020

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

32